UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT A. LUCIANO, JR., Trustee of The Robert A. Luciano Jr. Revocable Trust Dated February 27, 1995, | No.  11-cv-1831 TLN-KJN |
| Plaintiff, | **ORDER** |
| v. | |
| UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OFAGRICULTURE; TOM VILSACK, Secretary Of Agriculture; UNITED STATES FOREST SERVICE; TOM TIDWELL, Chief Forester; RANDY MOORE, Regional Forester of the Pacific Southwest Region; EARL FORD, Forest Supervisor of the Plumas National Forest; DEB BUMPUS, District Ranger, Beckworth Ranger District; and DOES 1-25, | |
| Defendants. | |

This matter is before the Court on the parties' cross-motions for summary judgment (See Defs.' Mot. for Summ. J., ECF 38; Pl.'s Mot. for Summ. J., ECF 33) in this environmental case in which Robert Luciano ("Plaintiff") seeks a remedy for Defendants' denial of Plaintiff's various Small Tracts Act Applications and other proposals to exchange land in the Plumas National Forest ("PNF") adjacent to Plaintiff's homestead property in Clio, California; or in the alternative, 18.5 acres in a large stretch of the Wild Zone of the Wild and Scenic River corridor of the Middle

1

Fork of the Feather River.[1]  (Pl.'s Compl., ECF 1 ¶ 1, 34.)  Plaintiff challenges Defendants'
repeated denials of his land exchange proposals under the Administrative Procedure Act
("APA"), which restricts a court's review to decisions that are arbitrary, capricious, or otherwise
contrary to law.  5 U.S.C. § 706(2)(a).  Also before the Court are Defendants', United States of
America, United States Department of Agriculture, Tom Vilsak, United States Forest Service,
Tom Tidwell, Randy Moore, and Deb Bumpus' (all Defendants, hereinafter collectively referred
to as "Defendants") motion to strike extra-record materials.  (ECF 38.)

Plaintiff asserts claims under the Small Tracts Act for "Failure to Adhere to the Plumas
National Forest Land and Resource Management Plan" and for Failure to Conform to the
Provisions of the Wild & Scenic Rivers Act.  (See ECF 1.)  Plaintiff seeks declaratory relief that
Defendants' conduct, as laid out in the complaint, was arbitrary and capricious.  (Id. at 16:22-23.)
Plaintiff requests that the Court issue a declaratory judgment that "Defendants' conduct in . . .
denying Plaintiff's Small Tracts Act applications made in 2007 and 2009 violated the mandates of
the federal Administrative Procedure Act."  (Id. at 16:26-2.)  Further, Plaintiff requests that the
Court "[r]emand the matters for further analysis and action in accordance with applicable law."
(Id.  at 17:6-7.)  Finally, Plaintiff also asserts a fourth claim for "Failure to Adhere to the
Provisions of the United States Forest Manual."  Plaintiff does not address this claim in its
motion, or in its opposition to Defendants' motion.  Indeed, Plaintiff has failed to demonstrate
how such a "failure" constitutes a cognizable claim.  As such, Defendants' motion for summary
judgment as to this claim is granted.

///
///
///
///
///
///

---

[1]      Because oral argument will not be of material assistance, the Court orders this matter
submitted on the briefs. E.D. Cal. L.R. 230(g).

# BACKGROUND[2]

It is undisputed that in February 1874 Ezra Culver and his family moved into their home in Plumas County, California, on Lot 2 of the NE 1/4 of Section 1, T22N, R12E.  Culver received Homestead Patent No. 1523 for 40.70 acres in Lot 2 of the NE 1/4 of Section 1, T22N, R12E on May 10, 1882.   (DUF # 1.)  Plaintiff purchased the property in October 1995, two years after the United States Forest Service ("USFS") conducted a survey to determine the boundary lines of the PNF.  (DUF ## 3, 5.)  The survey revealed that the PNF boundary line bisected the old Culver homestead cabin.  (DUF # 4.)

On January 13, 2000, Plaintiff sent a letter to the PNF forest supervisor acknowledging that the 1993 survey bisected the old Homestead cabin.  (AR 1-2.)  The letter acknowledged that the cabin was not restorable and should be destroyed.  (DUF # 9.)   Plaintiff further noted that a number of items were located on the property, including a generator powered by a pelton wheel and penstock facility, which were "quickly deteriorating."  (Id.)  Plaintiff proposed that he "purchase property desired by the [forest service] equal of value to the 20 acre parcel . . . and use the parcel in trade."[3]  (DUF # 10.)

Forest Lands Officer Fred Krueger responded, stating that it would be "inappropriate for the Plumas National Forest to identify a property it would be interested in acquiring" and subsequently trade for that parcel with Plaintiff.  (DUF # 12.)  Krueger explained that "[a]t this time, [USFS] does not have the capability to complete any additional land exchanges."  (Id.)  In an email between USFS employees discussing whether to accept Plaintiff's proposal, they

---

[2]     The background section will reference facts from three sources.  Where the facts are undisputed, the court will reference Defendants' statement of undisputed facts.  (See Defs.' Statement of Undisputed Facts ("DUF"), ECF 39.)  Where facts are *genuinely* disputed, the court will reference one of two sources.  The first, titled Administrative Record (hereinafter "AR"), contains documents from the United States Forest Service.  (Notice of Filing of Administrative Record, ECF 8.)  The Second, titled Supplemental Administrative Record ("SAR"), also contains documents provided by the United States Forest Service.  (Notice of Filing of Supplemental Administrative Record ("SAR"), ECF 19.)  Unless otherwise noted herein, where the parties dispute a characterization of a fact, the court has referenced the record, found the representation to be accurate, and therefore considers the fact undisputed.

[3]     The court notes that only Plaintiff's 2007 and 2009 land-exchange proposals form the bases of his claims.  Regardless, the court recounts the extensive history of Plaintiff's repeated proposals and the USFS' subsequent denials as they provide context to the court's analysis.

1    assessed whether the alleged improvement (the cabin) would add value to the land, and

2    determined that it was highly questionable that it would.  (AR 12.)

3         In 2001, Plaintiff sent another application for either a purchase or interchange under the

4    Small Tracts Act ("STA").  (DUF # 16.)  The then acting district ranger responded as follows:

5    "[l]ast fall we visited the site in response to a water rights question.  It was noted then that the

6    condition of the structure is such that it offers little value, if any, to the lands.  Therefore, I cannot

7    determine any merit in proceeding with a Small Tracts case."  (DUF # 17.)

8         In 2002, the Office of Historic Preservation found that "the poor integrity of the site, on

9    both public and private properties, has severely compromised its ability to convey any historical

10   significance," and thus, "is not eligible for the National Register of Historic Places."  (AR 24.)  In

11   reaching this decision, the agency concluded that "most of the associated structures at the site

12   have collapsed and/or have been removed long ago.  The ranch house still stands but it is in

13   extremely poor condition."  (Id.)  In a subsequent 2003 study, the agency again found that "[t]he

14   poor integrity of the site has severely compromised its potential to convey any significant

15   historical associations . . . ."  (SAR 444.)

16        On July 7, 2003, Plaintiff again contacted the forest service with an "unofficial proposal to

17   do a land exchange with the Plumas National Forest."  (DUF # 21; see also AR 28.)   On March

18   31, 2004, District Ranger Dillingham wrote Plaintiff's representative to address the proposal.

19   Dillingham explained that the forest Service did not, at the time, have sufficient resources to pay

20   for the "considerable oversight and review" function necessary to complete the exchange.  (AR

21   30.)   Forest Supervisor James Peña explained to Plaintiff's representative that "[r]esolution of the

22   boundary trespass is best achieved by removing the uninhabited structure (the Culver Homestead)

23   off National Forest Land, not by exchange."  (AR31.)

24        On November 10, 2004, Plaintiff made a formal offer for an exchange of land.  Plaintiff

25   proposed that he acquire 40 acres of land and, in exchange, Plaintiff would "provide [USFS] with

26   offered lands equal in value to the selected 40 acre parcel."  (AR 35.)  Plaintiff offered to pay for

27   all costs of the exchange.  (Id.)  The forest service land adjustment team, when consulted about

28   the proposed exchange, pointed out that the "Forest Service cannot exchange [national forest

4

service] land for property whose value exceeds that of [national forest service land] by more than 25%." (DUF # 28.)

On November 21, 2005, in response to a letter from Congressman Doolittle,[4] "Forest Service Lands Officer Fred Krueger,[5] Public Service Staff Member Lynne Ingram, PNF Engineer Mark Beaulieu, Plaintiff Luciano, Plaintiff's accountant, Plaintiff's project engineer and Plaintiff's consultant all toured the 40 acres of NFS land that Plaintiff proposed to acquire in order to gather information." (DUF #30.) Fred Krueger noted that "both parcel[s] lack access and adjoined already developed property."[6] (AR 55; DUF #31.) After the tour, Forest Supervisor Peña sent Congressman Doolittle[7] a letter pointing out that "the parcels offered by Plaintiff were outside the Plumas National Forest Boundary, had limited access, were surrounded by private property, and did not allow the USFS to 'optimize land ownership patterns,' one of the main objectives of the land exchange program." (DUF # 32.)

In 2006, Plaintiff reached out to Senator Dianne Feinstein requesting assistance with his exchange proposals. (DUF # 30.) In response to an inquiry from Senator Feinstein, Regional Forest Manager Bernard Wingart wrote Senator Feinstein, stating: "Investigation and evaluation of the lands offered by Mr. Luciano, by staff of the Plumas National Forest, determined that these lands are outside the boundary of the Forest, have dubious legal access for public purposes, and are inappropriate for National Forest use. Our review of the information provided by Mr. Luciano and by the Forest leads us to the same conclusion." (SAR 522.)

///

---

[4]     Plaintiff initially contacted Congressman Doolittle requesting his help obtaining the land exchanges he desired.

[5]     Plaintiff states that Mr. Krueger was a Timber Management Officer, not a Lands Staff Officer or a Ranger.   This distinction is inconsequential to the court's analysis.

[6]     Plaintiff objects to this statement, citing a number of maps and schematics contained in the record. (See Pl.'s Response to DUF, ECF 43 #31.)   Under the APA, it is not the court's province to second guess the USFS' expertise in such matters; the court's only duty is to determine whether agency action is arbitrary, capricious, or contrary to clearly established law. As such, Plaintiff's objection is overruled.

[7]     Peña sent this letter in response to a letter received by the Congressman encouraging the forest service to "explore all options regarding a land exchange with Mr. Robert A. Luciano." (See DUF #29.)

"On April 24, 2007, acting Forest Supervisor Knopp advised Plaintiff that the USFS was not interested in his latest proposal for a land exchange" relative to the "40 acres of NFS land which included the Culver Homestead for an 18.5 acre mining claim adjoining the middle fork of the Feather River, but was willing to complete a 'STA boundary adjustment' of 30 feet." (DUF 36.)  Knopp further permitted Plaintiff to remove the Pelton wheel so long as no ground disturbing activities occur; Plaintiff never responded.  (DUF 37.) [8]

On August 8, 2007, Plaintiff submitted another Small Tracts Act application, seeking to resolve the encroachment on his property by acquiring USFS' ownership in "the north 58.39 feet of the $SW_{1/4}$ of the $NE_{1/4}$ of Section 1 T2iN, Ri2E, MD.B&M." (DUF # 39.)[9]  It appears from the record, that no significant progress was made on the 2007 proposal until approximately July, 2009, when Plaintiff's engineer contacted the USFS to discuss the proposal. (AR 385.)  The record is devoid of any indication that further progress was made on this proposal.

Plaintiff submitted *another* proposal in November 2009, offering to exchange an 18.5 acre parcel Plaintiff maintains is "the only remaining piece of private land in a large stretch of the Wild and Scenic River Corridor of the Middle For of the Feather river." (DUF # 44.)  Forest Supervisor Alice Carlton responded on December 9, 2009, that USFS would need to conduct thorough research before responding to his proposal.  (DUF #45.)

///

///

///

---

[8]     Defendants assert that a review of the land Plaintiff was offering in exchange for NFS land revealed massive amounts of junk, military surplus and potential hazmat due to abandoned vehicles, batteries, etc. (DUF #38.)   In support of this contention, Defendants cite SAR 526, which provides a handwritten "note to file" stating that the junk is on the property.  The court finds that this handwritten note is unreliable evidence, and therefore declines to consider it.

[9]     Defendants aver that the "matter was referred from the local forest service office, which reviewed the situation and declined to proceed with a STA adjustment because Plaintiff  was not an "innocent" build, as the fact that the boundary bisected his property was public information before he bought the land." (DUF # 7.)  The evidence cited by Defendant does not support this specific proposition.  (See AR 77.)   The record does contain, however, and email from a forest engineer to Alice Karlton, the forest supervisor, explaining that the USFS did not respond to Luciano's proposal after they received a no support decision from the regional office.  (AR 76.)

On December 10, 2009, Howard Whitman, a USFS employee in boundary and title management conveyed the following message to Ann Taylor, a USFS' realty specialist:

> I looked at the map for this parcel, and it was as I feared: there was only one piece on the Middle Fork that fits the description, and this is it. Before anybody even considers this I think someone should go to the parcel being offered and take a look. You will need an exceptionally powerful 4WD vehicle, because the "road" to it is nearly a 40 degree slope. I have been there. In 1977 I was a GS-4 Engineering Tech. on the Plumas and I was asked to survey the route for the PTC, which crosses the river just upstream from this parcel (that's another whole story). During construction of the trail I went there several times with the FS inspector. Because the road is so steep, there were numerous old cars, trucks, bulldozers, etc. at the bottom that will probably never leave there, along with mining equipment and some buildings. In my opinion, removal of the vehicles alone would be a prohibitive cost and a major logistics problem. I am quite sure there are Hazmat issues: the people mining at that time were not exactly the most environmentally conscious around.

(AR84-85.)  Ann Taylor then contacted District Ranger Deb Bumpus and explained that the USFS was "not considering addition land exchanges" at that point because they had not cleared then existing land exchanges.  (AR 86.)  Ann Taylor also noted that there might be hazmat issues with the property, and discussed the issue of whether such an exchange would in fact be in the public interest, given funding and scarcity.  (Id.)

On March 1, 2010, Forest Supervisor Carlton advised Plaintiff that, after discussion with the district ranger, the forest engineer, a member of the Regional Office Lands Team, a public service staff officer, and after consideration of the proposed exchange, Plaintiff's exchange proposal would be denied.  Carlton explained as follows:

> [I]t is not in the best interest of the public for the Forest Service to enter into this land exchange. Referencing Code of Federal Regulations, Title 36, part 254.36, Subpart C(2), I do not support that the exchange improves efficiency and utilization of NFS lands. This decision affirms a previous denial of this proposal, issued to you by Acting Forest Supervisor Chris Knopp, on April 24th, 2007. In addition, the Forest denied your similar requests for exchanges of other privately held parcels in 2000 and 2004. Please understand the Forest has no interest in conveying the 40 acre parcel adjacent to your property. . . .  The April 24th, 2007 letter from Acting Forest Supervisor Chris Knopp expressed willingness to consider a Small Tracts Act (STA) adjustment with regard to the homestead structures on NFS lands. Further investigation into this issue reveals this case does not qualify for STA due to patent knowledge of the boundary circumstances prior to your purchase of the property. . . .

> The Small Tracts Act is intended to correct parcels that in 'good faith' relied upon an erroneous survey, and erroneous title search, or other land descriptions that indicated that there was not an encroachment. You had the opportunity to conduct a title search prior to purchasing the property and the property line was reestablished and recorded by the Forest Service before you purchased the property. Therefore, your request for the Forest Service to consider a land exchange under the Small Tracts Act is denied without further consideration.

(AR 92-93.)

Despite Carlton's admonition that the proposal was denied without further consideration, on April 12, 2010, Plaintiff sent the forest supervisor a letter requesting to meet to further discuss the land exchange proposal.  (AR 381.)  On April 11, 2011, Plaintiff was again admonished by District Ranger Bumpus that "the Forest has no interest in either conveying the land adjacent to your parcel nor in acquiring the parcel you own in the Middle Fork of the Feather River."  (DUF # 55.)  Bumpus further stated none of Plaintiff's "land exchanges qualified under the Small Tracts Act and no further consideration will be given to any future land exchange proposals."  (Id.)

## STANDARD

### A.   Summary Judgment

When parties submit cross-motions for summary judgment, the court must review the evidence submitted in support of each cross-motion and consider each party's motion on its own merits.  Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).  Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

8

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. at 324.  Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.

     If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 251-52.

     In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

     In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1  produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight

2  Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

3      Finally, to demonstrate a genuine issue that necessitates a fact finder, the opposing party

4  "must do more than simply show that there is some metaphysical doubt as to the material facts  .  .

5  . . Where the record taken as a whole could not lead a rational trier of fact to find for the

6  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87, 106 S.

7  Ct. at 1356.

8      **B.      APA**

9       Under the APA, the court may set aside a final agency action only where the action is

10  "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law."

11  5 U.S.C. § 706(2)(A);  Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d, 846,

12  858 (9th Cir. 2004).  The court may not substitute its own judgment for that of the agency.  Ocean

13  Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846, 858 (9th Cir. 2005).  The court

14  should ask "whether the [] decision was based on a consideration of the relevant factors and

15  whether there has been a clear error in judgment."  Id. at 859 (citing Citizens to Preserve Overton

16  Park, 401 U.S. 402, 416 (1971)).  In addition, the court determines "whether the [agency]

17  articulated a rational connection between the facts found and the choice made."  Id. (quoting

18  Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife Serv., 273 F.3d 1229, 1236

19  (9th Cir. 2001)).  "The APA does not give this court power to substitute its judgment for that of

20  the agency, but only to consider whether the decision was based on a consideration of the relevant

21  factors and whether there has been a clear error of judgment."  Dioxin/Organchlorin Ctr. v. Clark,

22  57 F.3d 1517, 1521 (9th Cir. 1995) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401

23  U.S. 402, 416 (2007)) (internal quotations omitted).

24      The arbitrary and capricious standard under the APA is "highly deferential, presuming the

25  agency action to be valid and [requires] affirming the agency action if a reasonable basis exists

26  for its decision."  Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir 2006) (internal

27  citations and quotations omitted).  Thus, a reviewing court under the APA should uphold even "a

28  decision of less than ideal clarity if the agency's path may be reasonably discerned."

10

1    Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007).

2                                    **ANALYSIS**

3    **A.    Motion to Strike Extra-Record Material[10]**

4            Defendants assert that this court's review should be limited to the administrative record,

5    and the court should disregard the extra-record material proffered and relied upon by Plaintiff.

6    Specifically, Defendants assert Exhibits 1, and 6-13 are "extra-judicial declarations, depositions,

7    and other documents" that should not be considered by the court.  (ECF 38-1 at 7:19-21.)

8            Defendants point to this Court's December 19, 2012, order wherein the Honorable

9    Garland E. Burrell's denied Plaintiff's motion to shorten time to augment the administrative

10   record with deposition testimony.  (See ECF 31.)  Defendants insist that attaching the extra-

11   record material in support of Plaintiff's motion for summary judgment is contrary to Judge

12   Burrell's order denying Plaintiff's motion to shorten time to hear Plaintiff's motion to augment

13   the administrative record.  In the alternative, Defendants argue that the extra-record material

14   cannot be considered because the materials submitted by Plaintiff are not necessary to determine

15   whether the agency considered all relevant factors.  (Id. at 8:3-4.)  Plaintiff asserts that the extra-

16   record material explains complex matters and properly demonstrates the inadequate scope of the

17   USFS' consideration of Plaintiff's proposals.  (See generally ECF 44.)

18           "Judicial review of an agency decision typically focuses on the administrative record in

19   existence at the time of the decision and does not encompass any part of the record that is made

20   initially in the reviewing court."  Sw. Ctr. For Biological Diversity v. United States Forest Serv.,

21   100 F.3d 1443, 1450 (9th Cir. 1996) (Holding that the district court properly struck extra-record

22   documents submitted by plaintiff.)  In the Ninth Circuit, a court may only consider extra-record

23

---

24   [10]    The court notes that, instead of providing and citing directly to the administrative record,
     as is standard protocol in cases under the APA, Plaintiff has lodged with the court what Plaintiff
25   labels "appendix of evidence."  Attached to the appendix are a number of exhibits.  Many of these
     exhibits are taken directly from the administrative record; however, exhibits 1 and 6-13 are extra-
26   record materials that Plaintiff relies on in his motion for summary judgment.  The extra-record
     materials include declarations, maps, documents describing the history of the Culver homestead,
27   the 1973 Bureau of Land Management's Instructions for Survey of Public Lands, and deposition
     testimony in a separate, but somewhat related case.
28

1    materials: "(1) if necessary to determine whether the agency has considered all relevant factors

2    and has explained its decision, (2) when the agency has relied on documents not in the record, or

3    (3) when supplementing the record is necessary to explain technical terms or complex subject

4    matter." Id. (citing Inland Empire Pub. Lands Council v. Glickman, 88 F.3d 697, 703–04 (9th

5    Cir.1996)) (internal quotations omitted).  These exceptions to the general rule that a court's

6    review of agency action under the APA is limited to the administrative record are "narrowly

7    construed and applied."  Lands Council, 395 F.3d at 1030.

8         The court has reviewed the extra-record materials submitted by Plaintiff and finds that

9    none of the documents submitted by Plaintiff concurrently with his motion for summary judgment

10   fit within any of the narrow exceptions to the general rule that the court's review is limited to the

11   administrative record.  First, the court has scrupulously reviewed the administrative record and

12   finds that the record itself is replete with examples of the factors the USFS considered in

13   contemplating Plaintiff's proposed land exchanges.  Moreover, there is no indication that the

14   USFS relied on anything not set forth in the administrative record.  Finally, the administrative

15   record sets forth in plain, understandable language the reasons for the USFS' actions in this

16   matter.  As such, the court declines to extend its review to extra-record material and will limit its

17   review to the complete record lodged with this court.[11]

18   ///

19

20   [11]    The court further notes that, in cases of this nature, "we would expect litigants to seek to
     supplement the record . . . before seeking to expand the record before the district court."  Lands
21   Council, 395 F.3d at 1029 n.10.  In this case, Plaintiff had months to seek leave of court to
     augment the administrative record, but failed to do so until the last minute, after the deadline for
22   filing such a request.  Indeed, this is the very reason Judge Burrell denied Plaintiff's motion to
     shorten time to hear the motion to augment the record.  While the court acknowledges that it has
23   the discretion to consider the extra-record material, it is disturbed by counsel's failure to timely
     move to augment the record and subsequently filing the extra-record material after Judge Burrell
24   denied Plaintiff's motion to shorten time to hear his motion to augment the record.
25        The court also notes that some of the extra-record material submitted by Plaintiff could
     have been brought to the attention of the USFS prior to making its decision.  The Ninth Circuit
26   has held that a district court should not consider extra-record material that the party objecting to
     agency action could have submitted to the agency prior to making its decision.  See Havasupai
27   Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir. 1991) ("Absent exceptional circumstances, such
     belatedly raised issues may not form a basis for reversal of an agency decision.")
28

**B.      Cross-Motions for Summary Judgment**

Both parties move for summary judgment on Plaintiff's claims.  Defendants assert that they are entitled to summary judgment on all of Plaintiff's claims because the record is replete with examples of the numerous reasons the USFS denied each of Plaintiff's repeated proposals to exchange forest service land, and thus, the USFS' actions were neither arbitrary nor capricious. Plaintiff maintains that the reasons stated in the record for denying Plaintiff's proposals were merely a pretext to avoid dealing with Mr. Luciano, thereby rendering their denials of Plaintiff's Small Tracts Act exchange proposals arbitrary and capricious.

   *i. Denial of Plaintiff's 2007 & 2009 STA Applications*

Defendants move for summary judgment on Plaintiff's claim that the USFS' decision to deny Plaintiff's STA applications[12] violated the APA, arguing that the record demonstrates that the USFS' decisions to deny Plaintiff's repeated exchange proposals were neither arbitrary nor capricious.  The STA provides that the secretary of agriculture is "authorized, when the Secretary determines it to be in the public interest, to sell, exchange, or interchange . . . all rights, title and interest . . . in and to National Forest System land . . . ." 16 U.S.C. § 521d(1).  "The Secretary *is not required to exchange any federal lands*.  Land exchanges are discretionary, voluntary real estate transactions between federal and non-federal parties." 36 C.F.R. § 254.3(a) (emphasis added).

The STA's implementing regulations provide that conveyances are limited to tracts of ten acres or less for purposes of resolving encroachments by persons: "(1) To whom no advance notice was given that the improvements encroached or would encroach; and (2) Who in good faith relied on an erroneous survey, title search, or other land description which did not reveal such encroachment." 36 C.F.R. § 254.32(a).  In the case of encroachments, "[f]orest service officials shall consider the following factors when determining whether to convey lands upon which encroachments exist: (1) The location of the property boundaries based on historical

---

[12] The court notes that there is somewhat of a dearth of case law analyzing STA land exchange proposals under the APA.  The court, however, need not conduct its analysis in a vacuum.  Specifically, the court is guided by the language of the STA itself, the STA's implementing regulations, and, of course, the standards set forth in the APA.

1    location and continued acceptance and maintenance, (2) Factual evidence of claim of title or color

2    of title, (3) Notice given to persons encroaching on National Forest System lands, (4) Degree of

3    development in the encroached upon area, and (5) Creation of an uneconomic remnant."  Id. §

4    254.32(b).

5          After analyzing the factors set forth § 254.32, the court must ensure a conveyance would

6    be in the public interest.  36 C.F.R. § 254.36(b).[13]  In determining whether the public interest will

7    be serviced the, officials should consider:

8              (1) Sale, exchange, or interchange of the affected lands is not
               practicable under any other authority of the Secretary;   (2)
9              Administration and management of National Forest System lands
               will be more efficient and will result in improved utilization;  (3)
10             Access to and use and enjoyment of National Forest System lands
               by the general public will not be unduly impeded or restricted; (4)
11             New or extensive inholdings which would create management
               problems will not be established; (5) Scenic, wildlife,
12             environmental, historical, archaeological, or cultural values will not
               be substantially affected or impaired; (6) Existence of structures
13             authorized under a special use permit or easement, and (7)
               Applicable Federal, State, and local laws, rules, regulations, and
14             zoning ordinances will not be violated.

15    36 C.F.R. § 254.36(c)(1)–(7).

16         This Court finds that the record clearly demonstrates that the USFS' decisions to deny

17    Plaintiff's STA applications were neither arbitrary nor capricious.  Indeed, the record is replete

18    with numerous correspondence explaining and supporting the various reasons the USFS

19    determined that Plaintiff's exchanges would be neither beneficial to the USFS nor in the public

20    interest.

21         First, as Defendant correctly notes, pursuant to the STA, Plaintiff is not a person who did

22    not have advance notice that an encroachment existed.   16 U.S.C. § 521d(1).  It is undisputed that

23    Plaintiff purchased the home *after* the 1993 survey—which was publicly recorded[14] in the local

24    County Recorder's office—establishing that boundary line bisected the old culver homestead.

25    _____

      [13]     Section 206 of the Federal Land Policy & Management Act *forbids* land exchanges unless
26    the "public interest will be well served."  43 U.S.C. § 1716(a).

      [14]     Plaintiff asserts that it is "dubious at best" that the 1993 survey demonstrating the
27    encroachment was recorded.  Plaintiff, however, provides no evidence in support of this assertion.
      Defendants, conversely, have provided in the administrative record the specific survey of the
28    Luciano land demonstrating that the Erza Culver cabin bisects the property boundary.  (AR 73.)

1    The record also demonstrates that the property Plaintiff seeks to exchange is void of any

2    improvements.  As Defendants note, the record reflects that Plaintiff himself stated that the

3    Culver Homestead "is not restorable, and should be leveled and removed."  (AR 2.)  As such,

4    forest service employees reasonably found that the homestead likely is not worth much, and thus,

5    was not an improvement for purposes of the STA.  (AR 12.)   Thus, an "uneconomic remnant"

6    exists on the property.  See 36 C.F.R. § 254.32(a)(5).

7    Additionally, the Office of Historic Preservation's review of the property also

8    demonstrates that the factors set forth in 36 C.F.R. § 254.32(a) do not support adopting Plaintiff's

9    land exchange proposal.  Specifically, in 2002, the NRHP found that "the poor integrity of the

10   site, on both public and private properties, has severely compromised its ability to convey any

11   historical significance."  (AR 24.)

12   Finally, the record demonstrates that the USFS set forth numerous reasons supporting

13   their conclusion that Plaintiff's exchange proposals were not in the public's interest.  For

14   example, on December 10, 2009, Howard Whitman, a USFS employee, sent Ann Taylor, a USFS

15   realty specialist correspondence describing the parcel Plaintiff sought to exchange in the 2009

16   application.  That letter stated that access was impossible without a 4WD vehicle[15]; the access

17   road was littered with cars, trucks and bulldozers, mining equipment, the removal of which would

18   cause major logistics problems; and that there were likely hazmat issues.  (AR 84.)   It stands to

19   reason, therefore, that the "[s]ale, exchange, or interchange of the affected lands [was] not

20   practicable under any other authority of the Secretary."  See  36 C.F.R. § 254.36(c)(1).

21   Moreover, on March 1 2014, Forest Supervisor Carlton sent Plaintiff a letter informing Plaintiff

22   that his exchange proposal was not in the best interest of the public because it would not improve

23   the efficiency and utilization of NFS lands.  (AR 92 (citing 36 C.F.R. § 254.36(c)(2).)   Carlton

24   further noted that "this decision affirms a previous denial of this proposal" and that the "Forest

25   denied similar requests for exchanges of other privately held parcels in 2000 and 2004.  (AR 92.)

26   ///

27

28   [15]    Indeed, Plaintiff admits that the parcel he offered in exchange for NFS land "was difficult
     (although not impossible) to access by vehicle."  (ECF 11:6-7.)

1    Based on the foregoing facts set forth in the record, the court finds that USFS was well

2    within its broad discretion to deny plaintiff's repeated land exchange proposals under the STA.

3    As Defendants note, the USFS' decision was clearly not made in a vacuum.  The record is replete

4    with conversations, correspondence, site visits, review of information submitted by Plaintiff,

5    responses to congressional inquiries, and consultations with the Office of Historic Preservation.

6    All of the work done by the USFS, and contained within the record, was performed in

7    contemplation of Plaintiff's numerous land-exchange proposals.  Based on the foregoing, the

8    USFS clearly "articulated a rational connection between the facts found and the choice made."

9    Ocean Advocates, 402 F.3d at 859.

10    Further, the STA's regulations clearly state that the USFS "*is not required to exchange*

11    *any federal lands*.  Land exchanges are discretionary, voluntary real estate transactions between

12    federal and non-federal parties."  36 C.F.R. § 254.3(a) (emphasis added).  Thus, the Court finds

13    that Defendants here were not required to exchange federal lands for the lands proposed by

14    Plaintiff.  Because the "court is not to substitute its judgment for that of the agency," and because

15    the record demonstrates that "the agency's path may reasonably be discerned," Defendants'

16    motion as to Plaintiff's STA claim is therefore GRANTED and Plaintiff's motion is DENIED.

17    F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513-14, (2009);  Nat'l Ass'n of Home

18    Builders, 551 U.S. at 658.

19    *ii.    Violation of the PNF Forest Plan*[16]

20    Both parties move for summary judgment on Plaintiff's claim that Defendants violated the

21    National Forest Management Act ("NFMA") by failing to adhere to the Plumas National Forest

22    ("PNF") Land and Resource Management Plan ("LRMP").  Plaintiff maintains that the USFS did

23    not adhere to the PNF LRMP when it declined Plaintiff's offer to exchange 18.5 acres in "a large

24    stretch of the Wild Zone of the Wild and Scenic River corridor of the Middle Fork of the Feather

25    River."  (ECF 33 at 5:1-5.)  Defendants argue that nothing in the PNF LRMP requires that the

26

27    [16]    Plaintiff also asserts that Defendants violated the Sierra Nevada Forest Plan.  Plaintiff,
however, did not plead a violation of the Sierra Nevada Forest Plan in the operative complaint.

28    As such, the court does not address Plaintiff's argument in this regard.

16

1  USFS exchange its own property with non-federally owned property. (ECF 38-1 at 12:22-23.)

2  Defendants note that the Federal Land Policy Management Act provides that "the public lands be

3  retained in Federal ownership, unless as a result of the land use planning procedure provided for

4  in this Act, it is determined that disposal of a particular parcel will serve the national interest."

5  (Id. at 12: 25-27.) Defendants maintain that the USFS properly concluded that exchange of

6  federally owned land for the parcel offered by Plaintiff was not in the national interest.

7      National forests are administered under the NFMA. 16 U.S.C. § 1601 *et seq.* The NFMA

8  mandates the development of land and resource management plans. 16 U.S.C. § 1604. The

9  Plumas National Forest operates pursuant to the PNF LRMP. The PNF LRMP's general

10 direction and standards/guidelines sections provide that the forest service should attempt to

11 acquire, if possible, fee title to all land within the wild and scenic zones of the middle fork of the

12 Feather River.

13 (AR 360.)

14     The PNF LRMP further provides that the USFS should attempt to resolve unauthorized

15 occupancies by land exchange "as best serves the public interest." (AR 364.) Finally, the PNF

16 LRMP directs the USFS to consider ownership adjustment's on a case-by case basis. (Id.)

17 Agency actions challenged under the NFMA are reviewed to determine if they were arbitrary and

18 capricious, an abuse of discretion, or not in accordance with the law. Oregon Natural Resources

19 Council v. Lowe, 109 F.3d 521, 526 (9th Cir.1997).

20     Here, the Court finds that Defendants have not deviated from the PNF LRMP, and thus,

21 did not violate the NFMA. First, the court finds unavailing Plaintiff's contention that the PNF

22 LRMP *mandates* that the USFS exchange federal land for private land located within the wild

23 zone of the middle fork. Specifically, the PNF LRMP's statement that the USFS should attempt

24 to acquire fee title to land located within the wild zone is clearly listed under the section of the

25 forest plan titled *general direction and standards/guideline*. Clearly, this is not a mandate, but

26 rather a general guideline pursuant to which the USFS should analyze exchange proposals.

27 Indeed, the PNF LRMP specifically states that ownership adjustments should be considered on a

28 case-by-case basis. In this case, as set forth extensively *supra*, the forest service spent extensive

1   time considering Plaintiff's proposal and ultimately determined that acquiring the land Plaintiff

2   offered would not be in the public interest.  As such, the Court finds that Defendants' denials of

3   Plaintiff's proposals were not arbitrary and capricious, and thus, did not violate the NFMA.

4       Based on the foregoing, Defendants' motion for summary judgment on Plaintiff's claim

5   for violation of the PNF LRMP is GRANTED and Plaintiff's is DENIED.

6       *iii.    Wild & Scenic Rivers Act*

7       Both parties move for summary judgment on Plaintiff's claim for violation of the Wild

8   and Scenic Rivers Act ("WSRA").  Defendants argue that, similar to Plaintiff's claim for

9   violation of the LRMP, nothing in the WSRA required Defendants to exchange federally owned

10  land for the land Plaintiff offered.  Defendants note that the USFS has discretion to exchange

11  federal land, and in this case, Defendants determined that exchange of the land in question would

12  not be in the public's interest.

13      Plaintiff's argument in support of his claim under the WSRA mirrors his arguments in

14  support of his claim for violation of the PNF LRMP.  That is, Plaintiff argues that Defendants

15  violated the WSRA by declining to exchange federal land for 18.5 acres in the Wild Zone of the

16  Wild and Scenic River corridor because they were "required to acquire, if possible, fee title to all

17  private land within the Wild Zone of the Middle Fork of the Feather River."  (ECF 33 at 10:23-25

18  (citing the PNF LRMP).)  Plaintiff argues that "failure to follow provisions of the PNF Land

19  Resource Management Plan constitutions a violation of the WSRA."  (Id. at 11:1-2.)

20      The WSRA provides that "certain selected rivers of the Nation which, with their

21  immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish

22  and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing

23  condition, and that they and their immediate environments shall be protected for the benefit and

24  enjoyment of present and future generations."  16 U.S.C.A. § 1271.  The WSRA requires that

25  USFS prepare a comprehensive management plan addressing "resource protection, development

26  of lands and facilities, user capacities, and other management practices necessary or desirable to

27  achieve the purposes of this chapter."  16 U.S.C.A. § 1274(d)(1).  The middle fork of the Feather

28  River, where the parcel Plaintiff has proffered to the USFS is located, is designated as a

component of the national wild and scenic river system.  16 U.S.C.A. § 1274(a)(3).

Plaintiff's position as to his claim under the SWRA is unavailing for the same reasons Plaintiff's claim for violation of the PNF LRMP fails.[17]  Indeed, Plaintiff's argument under the WSRA is an almost identical reiteration of Plaintiff's argument as to the PNF LRMP.  Plaintiff cites no authority for his proposition that a violation of the forest plan also constitutes a violation of the WSRA.  Defendants are correct that the WSRA is simply devoid of any requirement that the USFS exchange federally owned land for the land Plaintiff proffered, even if it is located within the middle fork of the Feather River.  As stated above, the decision to acquire land in the wild zone of the middle fork of the Feather River is discretionary.   As such, Defendants' motion as to Plaintiff's claim under the WSRA is GRANTED and Plaintiff's motion is DENIED.

**CONCLUSION**

The record in the instant case clearly demonstrates that Plaintiff was frustrated in his inability to convince the forest service to engage in a land exchange that would procure him additional land in the PNF.  Mere frustration with agency action, however, does not render the USFS' decisions to deny his land-exchange proposals arbitrary and capricious for purposes of the APA.  This entire dispute could have been easily resolved at the outset of this almost two-decade long dispute by simply removing the Culver Homestead cabin—the minimal encroachment revealed by the 1993 survey.  Indeed, Plaintiff himself stated: "The old building is not restorable, and should be leveled and removed.  Rather than seek permission to do this, I believe it to be in the best interest . . . to purchase a property desired by the [forest service] of equal value to the 20 acre parcel and use the parcel in the trade."  (AR 1.)  If Plaintiff had simply removed the minimal encroachment, instead of repeatedly attempting to acquire what appears to be land more desirable to him, this dispute could have been averted.

As set forth above, because the record demonstrates that Defendants' actions were not arbitrary, capricious, or contrary to law, in accordance with the APA, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion is DENIED.  The clerk of the court is

---

[17]     That Plaintiff devoted only three paragraphs to his claim under the WSRA underscores the invalidity of this claim.

19

ordered to close this case.

Dated: April 16, 2014

Troy L. Nunley
United States District Judge